**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Judge Joan B. Gottschall |
| v. | ) | |
| | ) | Case No. 11 CR 0743 |
| FELIX DANIEL, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION & ORDER

On March 20, 2013, Defendant Felix Daniel was convicted of one count of wire fraud, in violation of 18 U.S.C. § 1343, and three counts of mail fraud, in violation of 18 U.S.C. § 1341. The counts related to his involvement as a member of a failed business endeavor called Rym Technology Holdings, LLC ("Rymtech"). Now before the court are Mr. Daniel's motion for a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29, and motion for a new trial, pursuant to Federal Rule of Criminal Procedure 33. For the reasons explained below, the motions are denied.

## I. LEGAL STANDARDS

Under Rule 29, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The defendant moving for a judgment of acquittal "'faces a nearly insurmountable hurdle'" because the court "'consider[s] the evidence in the light most favorable to the Government, defer[s] to the credibility determination of the jury, and overturn[s] a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could

find guilt beyond a reasonable doubt.'" *United States v. Blassingame*, 197 F.3d 271, 284 (7th Cir. 1999) (quoting *United States v. Moore*, 115 F.3d 1348, 1363 (7th Cir. 1997)).

Under Rule 33, a court may grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The decision to grant or deny a motion for [a] new trial rests within the sound discretion of the trial court." *United States v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989). The court may grant a new trial when "trial errors or omissions have jeopardized the defendant's substantial rights." *United States v. Reed*, 986 F.2d 191, 192 (7th Cir. 1993) (citation omitted). Rule 33 motions are disfavored and granted only in extreme cases. *See, e.g.*, *United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998).

## II. BACKGROUND

Mr. Daniel's company, Rymtech, advertised that it could assist homeowners in paying off their mortgage loans. As Vice President of Sales and Marketing, Mr. Daniel recruited homeowners to place their properties in the Rymtech program. Rymtech used nominee buyers, called "A buyers," to obtain financing from lenders. The A buyers purchased the properties from the homeowners, and the loans secured by the A buyers were used to pay off the homeowners' mortgages. The A buyers were paid to attend closings to purchase the properties. At the closings, the homeowners signed over title to the A buyers. The homeowners were given checks representing the equity in their properties, which they endorsed to Rymtech.

In theory, the equity in the properties was to be used to make high-yielding investments, which Rymtech would use to pay off the refinanced mortgage loans within five years. The homeowners were promised that they would then regain title to their homes, free and clear of a mortgage. Mr. Daniel, along with a co-inventor, applied for a patent for an invention entitled a "mortgage financial intervention system and method." In fact, however, most of the funds taken

in by Rymtech were used to operate the company. The program failed because it brought in insufficient revenue to meet Rymtech's obligations with respect to the mortgages.

Mr. Daniel was charged with four counts of wire and bank fraud. Count I charged that, between September 2003 and November 2006, he participated in a scheme to defraud and obtain money and property by means of materially false and fraudulent representations and omissions, which affected a financial institution. The indictment charged that on November 19, 2004, Mr. Daniel caused a transfer of funds over interstate wires representing the proceeds of a mortgage loan for an A buyer's purchase of a property. Counts II, II, and IV charged that Mr. Daniel caused to be delivered by United States mail letters from Rymtech to homeowners, which formed part of a fraudulent scheme to convince the homeowners that Rymtech would make mortgage payments on their behalf. Each of the three counts identified an owner or owners of a property in the Rymtech program (Individuals A & B, C, and D) to whom a letter from Rymtech was delivered.

Mr. Daniel requested that the court instruct the jury that it must unanimously find at least one particular false representation that Mr. Daniel made as part of the alleged fraudulent scheme. The government contended that unanimity as to the specific false representations or omissions forming the alleged scheme was not required. The court accepted the government's argument and declined to give the requested "unanimity" instruction as part of the jury instructions.

At trial, the government presented the testimony of the owners of five properties that participated in the Rymtech program. The homeowners testified that they met or spoke with Mr. Daniel before putting their homes into the program. In some cases, Mr. Daniel was present, along with the A buyer, when the homeowners attended meetings at a title company. The homeowners signed checks during the meetings that were given to Mr. Daniel or to another

representative of Rymtech.  They testified that nobody at the meeting explained what the checks were for.  In some cases, the homeowners were required to bring Rymtech additional checks in order to qualify to participate in the program because their homes had insufficient equity.  Each of the homeowners also signed a "lease and trust agreement."  In some cases, Mr. Daniel signed the agreements on behalf of Rymtech.  The homeowners claimed that they were told that title to their homes would be transferred back into their names in five years and that, in the meantime, their homes would be safe and would be placed in a "trust."  Some of the homeowners testified that they later contacted Mr. Daniel with concerns that their homes were in foreclosure or that their property taxes had not been paid, and he assured them that their homes were safe.  The homeowners testified that they received letters from Rymtech regarding the status of their properties.

The government also presented testimony regarding Rymtech's articles of incorporation and organization.  Rymtech was registered with the state of Michigan as an LLC from 2004-06, and Mr. Daniel was identified as a registered agent and member-manager of the LLC. According to testimony from a senior patent attorney of the United States Patent and Trademark Office, Mr. Daniel was identified as an inventor on a provisional patent application filed by Rymtech, entitled "mortgage financial intervention system and method."

One of Rymtech's loan processors, Dimona Ross, testified that she began working for Rymtech after attending a meeting at which Mr. Daniel was the main speaker.  He explained that he was able to pay off mortgages in five years using an investment method, on which a patent was pending.  Ms. Ross testified that Mr. Daniel was involved in deciding which homes would be accepted into the Rymtech program and in matching A buyers to properties, and that, in her opinion, he developed the Rymtech program and ran Rymtech.  She testified that Mr. Daniel told

her he had an investment strategy that would allow Rymtech to pay off the mortgages, but that he did not explain its details.

As a loan officer with Rymtech, Ms. Ross testified that she prepared about twelve loan applications for A buyers. She testified that Mr. Daniel instructed her as to how to do the loan applications, and that she was taught to list the subject properties as either second homes or investment properties. According to Ms. Ross, money for the down payments was wired by Rymtech into the A buyers' accounts, because the lender would not allow the loans if the down payment came from a source other than the borrower listed on the application. In some cases, Mr. Daniel provided Ms. Ross with leases indicating that an A buyer was collecting rent on Rymtech properties. That rent was listed as income of the A buyer on the loan application, in order to offset the A buyer's other mortgage debts, and the leases were submitted with the application. Ms. Ross stated that the leases were "manufactured" and listed false tenants. Ms. Ross further testified that she had entered into a plea agreement with the government and would receive consideration at sentencing for her cooperation in Mr. Daniel's case.

The government presented testimony from a senior investigation research specialist at Fremont Reorganizing Corporation ("Fremont"), a lender in California. She stated that Fremont used loan applications to determine whether to lend to a particular borrower, and that Fremont examined the source of the down payment and the other properties owned by the borrower. A senior special investigator from the Federal Reserve Bank of New York testified that a wire transfer was initiated on November 19, 2004, from Fremont to Bank One in Chicago. The originator of the transfer was Eva Breckenridge, an A buyer for Rymtech, and the beneficiary was a title company.

Anthony Brown, owner of a property management company called Real Estate Assets, testified that his company took over property management for Rymtech and used monthly "rent" payments from the homeowners, along with money wired from Rymtech, to make monthly mortgage payments on the properties in the Rymtech program. Brown testified that Rymtech failed to pay taxes and insurance on the properties and that, by late 2005, Rymtech failed to wire Real Estate Assets enough money to cover the mortgage payments due each month. In early 2006, Mr. Daniel began choosing which mortgage payments would be made and which would not. Real Estate Assets received complaints from homeowners and passed them on to Mr. Daniel. Real Estate Assets was forced to cease operations for lack of funds by the end of 2006.

Two A buyers, Onshelle Jackson and Eva Breckenridge, testified that they purchased homes on behalf of Rymtech and were paid $1500 per transaction. Money was wired into their accounts to make the down payments, and they then brought checks to the closings. They later received calls from lenders about late payments on the mortgages and were told by Mr. Daniel that Rymtech was waiting for returns on its investments so that it could make the payments.

Joe Rizzo, an FBI employee with 21 years of experience as a financial advisor, testified that to pay off the mortgages on the subject properties in five years, Rymtech would have needed to realize a compounded annual growth rate of return on the equity in the properties of at least 10% and as much as 30%, provided that the entire amount of the equity was invested each month. He testified that he was unaware of any investments that could achieve that rate of return. John Devine, an FBI forensic accountant, testified that he had analyzed Rymtech's bank records. He noted that fees and overdraft charged were incurred numerous times during 2005. He stated that based on his calculations, approximately 85% of Rymtech's funds were spent on operations and approximately 6% on investments.

Mr. Daniel moved for a judgment of acquittal at the close of the government's case.  The court took the motion under advisement and allowed the case to go to the jury.  On March 20, 2013, the jury found Mr. Daniel guilty of all four counts.  He then renewed the motion for a judgment of acquittal.  The court allowed briefing by the parties.  In support of his motion, Mr. Daniel argues that the government presented no evidence that he had the required specific intent to commit fraud.  He further argues that he did not cause any of the mailings which form the basis for Counts II, III, and IV.

### III. ANALYSIS

#### A.  Sufficiency of the Evidence (Rule 29)

To establish wire fraud under § 1343, the government must prove Mr. Daniel's (1) participation in a scheme to defraud, (2) intent to defraud, and (3) use of interstate wires in furtherance of the fraudulent scheme.  *United States v. Sheneman*, 682 F.3d 623, 628 (7th Cir. 2012) (citing *United States v. Green*, 648 F.3d 569, 577-78 (7th Cir. 2011)).  Similarly, to establish mail fraud under § 1341, the government must prove the same elements, except that it must prove that the mails rather than interstate wires were used in furtherance of the scheme. *United States v. Walker*, 9 F.3d 1245, 1249 (7th Cir. 1993).

Mr. Daniel first argues that no evidence was presented that he had any intent to defraud homeowners by use of interstate wire transmissions or the U.S. mails.  He contends that the evidence at trial established that his involvement in Rymtech, as Vice President of Sales and Marketing, "was limited to marketing and sales."  (Def.'s Mot. for Acquittal 2, ECF No. 111.) He had no "knowledge of Rymtech's accounts or investment strategy."  (*Id.* at 3.)  He further contends that, even if Rymtech itself had a fraudulent intent, Rymtech's actions cannot be imputed to him individually.  (*Id.* at 6.)  Essentially, he maintains that he merely sold the

Rymtech program to interested homeowners and had nothing to do with the fraud that permeated the program.

"[I]ntent to defraud requires a wilful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." *Sheneman*, 682 F.3d at 628-29 (quoting *United States v. Howard*, 619 F.3d 723, 727 (7th Cir. 2010)). Viewing the evidence in the light most favorable to the government, there was sufficient evidence from which the jury could find beyond a reasonable doubt that Mr. Daniel willfully participated in a scheme to defraud both lenders and homeowners, and that the scheme involved interstate wires and the U.S. mails.

With respect to the fraud on lenders, Ross testified that Mr. Daniel told her to put false information in the loan applications, including the source of the down payments, false information about the buyer's intentions for the properties, and rent the buyer received from other properties. She testified that Mr. Daniel created fake leases that were submitted with the loan applications. Although Mr. Daniel argues that Ross's testimony is unreliable and self-serving, the court defers to the credibility determination of the jury in crediting her testimony. This testimony was sufficient evidence to satisfy the elements of wire fraud, including the existence of a scheme to defraud the lenders, and intentional acts of deception by Mr. Daniel. The scheme also involved the interstate wire transfer of loan proceeds. *See United States v. Mullins*, 613 F.3d 1273, 1281 (10th Cir. 2010) ("[W]ire transmissions are integral to other parts of real estate transactions, such as transferring funds.").

The government also presented ample circumstantial evidence of Mr. Daniel's intent to defraud homeowners. Testimony at trial established that Mr. Daniel made repeated statements to the homeowners that were false and misleading, in order to convince them to participate in the

Rymtech program. The homeowners testified that Mr. Daniel was sometimes present at the closings and signed documents on behalf of Rymtech. He told them that title to their homes would be transferred back into their names in five years and that meanwhile, their homes would be safe and would be placed in a "trust," and that Rymtech would make their mortgage payments. These statements were false: the homes were never placed in any type of trust, and the homes were by no means safe. Some of the homeowners testified that they later contacted Mr. Daniel with concerns that their homes were in foreclosure or that their property taxes had not been paid, and that he again assured them that their homes were safe and that their mortgage payments would be made. When homeowners complained about late mortgage payments, Mr. Daniel told them that Rymtech was waiting for a return on its investments and convinced some of them to continue making payments to Rymtech.

Other testimony was sufficient to support an inference that, at the time he made these communications to the homeowners, Mr. Daniel was aware of the nature of Rymtech's investment strategy, or lack thereof, as well as its inability to make the mortgage payments, and that the false statements were thus made made willfully, with knowledge of their falsity. Mr. Daniel played an active role in the Rymtech program, serving as a member-manager and a Vice President, and he was listed as a co-inventor on Rymtech's provisional patent application for the "mortgage financial intervention system and method." Several witnesses testified that he was a primary spokesperson for the Rymtech program at meetings they attended. Ms. Ross testified that Mr. Daniel told her he had an investment strategy that would allow Rymtech to pay off the mortgages.

Testimony at trial showed that Rymtech would have needed to achieve enormous returns on investment of the equity in the subject properties in order to meet its promises to

homeowners, but that the company had no real investment strategy and channeled most of the equity in the subject properties toward operating expenses. Mr. Daniel argues that an ordinary person of average intelligence and education would not have recognized the unlikelihood that Rymtech's investment strategy would succeed. But the evidence was sufficient to support the jury's determination that Mr. Daniel was aware that Rymtech could not make mortgage payments as promised because its investments were not, and could not be, sufficiently successful. Even had all of the equity been invested, the required returns on investment were wildly improbable, and only a small percentage of the equity was actually invested at all. The jury was entitled to conclude that it would have been obvious to anyone with Mr. Daniel's level of involvement in Rymtech's operations that the program could not succeed, and that Mr. Daniel deliberately misrepresented the company's financial situation as mortgage payments were missed and homeowners and A buyers began to express concerns.

Mr. Daniel also argues that there was no evidence that he personally caused to be mailed any of the letters specifically mentioned in Counts II, III, and IV, none of which bore his signature, or even that the letters traveled through the U.S. mails. The homeowners testified that they received letters from Rymtech by U.S. mail. The evidence also supported the inference that Mr. Daniel was aware of the letters. Moreover, even if Mr. Daniel did not personally direct the letters to be mailed, the mail fraud statute does not require that he personally caused the mailings. It suffices "that the use of the mails will follow in the ordinary course of business, or where such use can be reasonably foreseen, even though not actually intended." *Pereira v. United States*, 347 U.S. 1, 8-9 (1954). It was well within reason for the jury to conclude that, given Mr. Daniel's involvement in the Rymtech program, he could foresee that the mails would be used in the course of the scheme to defraud the homeowners. The jury could thus infer based

on the evidence presented that Mr. Daniel participated in a scheme to defraud which involved the U.S. mails.

**B.  Jury Instruction as to Unanimity (Rule 33)**

Mr. Daniel argues that he is entitled to a new trial based on the court's denial of his request for a jury instruction requiring the jury to unanimously determine beyond a reasonable doubt at least one false representation or omission that he made.  Regarding the alleged fraudulent scheme, the jury was instructed as follows:

> In considering whether the government has proven a scheme to defraud, the government must prove that one or more of the false or fraudulent pretenses, representations or promises charged in the portion of the indictment describing the scheme be proved beyond a reasonable doubt. The government, however, is not required to prove all of them.

Seventh Cir. Pattern Jury Instructions 393 (2012).  During the final jury instruction conference, Mr. Daniel requested the additional "unanimity" instruction set out in Pattern Instruction 4.04: "you must agree unanimously on which particular [. . . false statement] the defendant made, as well as all of the other elements of the crime charged." *Id.* at 42.  Mr. Daniel argued that the jury was obligated to unanimously find at least one false representation that formed part of the charged scheme.  The government, in turn, argued that unanimity was only required as to the existence of the scheme itself.  The court held that the government's view of the law was correct and declined to give Pattern Instruction 4.04.

As the Seventh Circuit explained in *United States v. Schiro*,

> Specific unanimity instructions, as distinct from a general instruction that the jury must unanimously find the defendants guilty beyond a reasonable doubt in order to convict . . . , are necessary only when there is a significant risk that the jury would return a guilty verdict even if there were less than unanimity with regard to one or more elements of the crime.

679 F.3d 521, 533 (7th Cir. 2012).  Jurors, however, do not have to agree unanimously on the *means* by which a defendant's conduct satisfies the required elements of the offense.  *Id.  See also Richardson v. United States*, 526 U.S. 813, 817 (1999) (stating that the jury need not agree on the "underlying brute facts" of a verdict, such as the means the defendant used to commit an element of the crime).

Participation in a scheme to defraud is an element of wire and mail fraud.  A "scheme to defraud" has been interpreted by the Supreme Court to "include [ ] everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future." *Durland v. United States*, 161 U.S. 306, 313 (1896).  Mr. Daniel argues that the false or fraudulent representations that make up the scheme are necessarily elements of the offense as well.  The government contends that the charges in the indictment were not based on any particular fraudulent statement or omission, and that the false pretenses, representations, and acts were—within the meaning of *Schiro* and *Richardson*—the means by which the scheme was carried out, rather than elements of the charged offense.

The Committee commentary to the Seventh Circuit pattern instructions offers no clear resolution to this dispute:

> [I]t is common for mail, wire, and bank fraud charges to include allegations regarding multiple false statements, promises, or representations. Since *Richardson*, the Seventh Circuit has not spoken on whether unanimity on the particular false statement, promise, or representation is required in such a case. Though it is likely that these constitute allegations regarding a means, and not an element, of the offense (the element being the existence of a scheme, not the particulars of how the scheme was executed), the Committee takes no definitive position on the point.

Seventh Cir. Pattern Jury Instructions 43 (2012).  The First, Eighth, and Ninth Circuits, however, have held that the particular false representations or omissions employed during a fraudulent

scheme are better understood as means by which the crime—i.e., the scheme to defraud—was committed. As the First Circuit explained:

> A jury, faced with "divergent factual theories in support of the same ultimate issue," may decide unanimously, as is the case here, that the government has proven a scheme to defraud even if they may not be unanimous as to the precise manner in which it occurred. [*United States v. Lee*, 317 F.3d 26, 36 (1st Cir. 2003)]. On this we are not alone. *See, e.g.*, *United States v. Rice*, 699 F.3d 1043, 1048 (8th Cir. 2012) (holding a jury is not required to agree unanimously on the particular means the defendant used in each fraudulent wire transfer); *United States v. Lyons*, 472 F.3d 1055, 1068-69 & n.11 (9th Cir. 2007) (no plain error in failing to instruct jury that it must be unanimous regarding theory of fraud). We therefore find no error, much less plain error, in the district court's failure to provide a unanimity instruction on which particular statement was false.

*United States v. LaPlante*, __ F.3d ___, 2013 WL 1919571, at *5-6 (1st Cir. May 8, 2013). The court follows the three circuits that have concluded that false representations or omissions are the means by which a fraudulent scheme is committed. Therefore, a unanimity instruction as to the specific false representations or omissions made by Mr. Daniel was not required, and the court's failure to give the requested unanimity instruction does not entitle him to a new trial. The court denies his Rule 33 motion accordingly.

### IV. CONCLUSION

For the reasons stated above, the court denies Mr. Daniel's Motion for a Judgment of Acquittal and his Motion for a New Trial.

ENTER:

_____/s/_____

JOAN B. GOTTSCHALL
United States District Judge

DATED: June 12, 2013